# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARC HOMER,               )
                                   )
  Plaintiff,              )
                                   )
v.                                )     Civil Action No. 15-1184
                                   )     Hon. Nora Barry Fischer
NATIONWIDE MUTUAL INSURANCE   )
COMPANY,              )
                                   )
  Defendant.           )
                                   )

## MEMORANDUM OPINION

### I.      INTRODUCTION

This is a diversity action filed by Marc Homer ("Homer" or "Plaintiff") against Nationwide Mutual Insurance Company ("Nationwide" or "Defendant") alleging insurance bad faith and violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201.1 *et seq*., for actions taken by Nationwide during a previous underinsured motorist trial between the same parties. Nationwide has moved for dismissal of this action on the grounds that Homer cannot rely on litigation conduct as the basis for an insurance bad faith claim under Pennsylvania law and that he has not sufficiently pled the elements of a UTPCPL claim. The case appears to present an issue of first impression with respect to litigation conduct and insurance bad faith. The Motion has been extensively briefed, (Docket Nos. 7, 9, 12, 19, 31, 39, 44), and the Court heard oral argument[1] on May 11, 2016. (*Id.*). The Motion is now ripe for disposition. After careful consideration of the parties'

---

[1] The parties elected not to order the transcript from the oral argument. (Docket No. 35).

positions and an exhaustive review of the relevant legal authority in Pennsylvania and other jurisdictions, for the reasons that follow, Nationwide's Motion to Dismiss [18] is granted.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Homer was injured in a motor vehicle accident on May 24, 2008.  (Docket No. 17 at ¶¶ 3-8).  He suffered a number of medical problems as a result of the accident, including traumatic head injury, impaired cognition, and neck and back problems.  (*Id.* at ¶ 9).  The third-party driver who crashed into Homer was insured up to $25,000.  (*Id.* at ¶ 11).  Homer eventually settled with the third-party driver for $24,500. (*Id.* at ¶ 31). At the time of the accident, Homer was driving a car owned by his mother, who had Underinsured Motorist ("UIM") coverage though Nationwide up to $500,000 for bodily injury.  (*Id.* at ¶¶ 14-19, 34).  Homer made a written demand for the full $500,000 to compensate him for the injuries he sustained.  (*Id.* at ¶¶ 25, 34).  Nationwide offered $12,500, which Homer rejected, and the case proceeded to trial in the Court of Common Pleas of Allegheny County.  (*Id.* at ¶¶ 34-37).

On June 1, 2015, while the trial was ongoing, Homer's counsel drafted, and the parties signed, a Binding "High-Low" Settlement Agreement (the "Agreement"),[3] which stipulated that Homer would receive a settlement payment within the range of $100,000 to $300,000, depending on the verdict of the jury. (*Id.* at ¶ 38; Docket No. 17-1 at 35-36).  In addition to a monetary settlement within the agreed-upon range, the Agreement contained the following provisions that are the basis of the present case:

> 5. All claims for bad faith for acts or omissions occurring <u>prior to</u> the date of the execution of this Agreement, including all claims contained in GD No. 13-009777,

---

[2] For the purposes of a Motion to Dismiss, the Court assumes as true the factual allegations in Homer's Amended Complaint. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016).
[3] Pennsylvania courts have held that high-low agreements are settlement agreements. *Vargo v. Mangus*, 94 Fed. Appx. 941, 943 (3d Cir. 2004).

are dismissed with prejudice and barred, released and controlled by this Binding High- Low Agreement.

6. Any claims for bad faith for acts or omissions occurring <u>after</u> the date of the execution of this Binding High-Low Agreement will not be barred by the Agreement.

(Docket No. 17-1 at 35-36) (emphasis added).

On the same day the Agreement was signed, Nationwide introduced into evidence videotaped testimony of two medical experts during its case-in-chief. (Docket No. 17 at ¶¶ 39, 41). The following day, June 2, 2015, both parties gave closing arguments, and counsel for Nationwide referenced the testimony of the medical experts. (*Id.* at ¶¶ 79-82). Homer alleges that Nationwide knew these experts were biased and, thus, committed bad faith by offering their testimony at trial and relying on same during closing arguments. (Docket No. 31 at 2). On June 2, 2015, the jury returned a verdict in favor of Homer for $1.61 million dollars. (*Id.* at 4). Two days later, Nationwide filed a motion to mold the verdict, seeking to have the Judge reduce the verdict to $300,000 and to dismiss Homer's bad faith claim for acts that occurred "as of June 1, 2015." (Docket No. 17 at ¶¶ 89-96). In response, Homer objected to the wording of Nationwide's motion, arguing instead that given the Agreement, it should reflect "all claims for bad faith or acts or omissions occurring prior to June 1, 2015" be dismissed with prejudice. (Docket No. 17-2 at 72-74, 77). The Court of Common Pleas of Allegheny County ruled in favor of Homer and against Nationwide. (Docket No. 31 at 16).

Homer filed the present lawsuit on September 10, 2015, alleging Nationwide acted in bad faith when it introduced the videotaped testimony of its experts at trial, referenced the experts' testimony during closing arguments, and filed the motion to mold with what Homer believes was inaccurate wording. (Docket No. 1). Nationwide moved to dismiss. (Docket No. 6). Following

briefing and argument, the Court ruled on the record that Homer's initial Complaint was conclusory in nature and did not meet the federal pleading requirements, after which Homer requested, and was granted, leave to amend. (Docket No. 14). Homer then proceeded to file an Amended Complaint which addressed in more detail his allegations of bias exhibited by Nationwide's experts, the use of those experts at trial, and the circumstances surrounding the Agreement. (Docket Nos. 17; 31 at 5). As requested by the Court, Homer also provided relevant portions of the trial transcript and the deposition testimony and reports of the challenged experts.[4] (*Id.*).

A. *Nationwide's Litigation Conduct*

Nationwide's first expert, Dr. Frances T. Ferraro, is a neurosurgeon. (Docket No. 17 at ¶¶ 43-44). The crux of Homer's argument regarding Dr. Ferraro's bias is that his testimony contradicted his report. (*Id.* at ¶¶ 69, 81-83). Dr. Ferraro noted in his report that Homer's ". . . major problem at this time appears to be his cognitive memory issues." (Docket No. 31 at 8). Nevertheless, at his deposition, and after "Nationwide's employee met with [him] in private," Homer claims Dr. Ferraro dramatically changed his testimony. (*Id.*) ("The doctor instead testifies that Plaintiff's major 'complaint' during Dr. Ferraro's examination was not neck or back pain, but, actually from *Plaintiff's perspective a complaint* about impaired cognition. Dr. Ferraro then concluded in his deposition that as a neurosurgeon, he was not qualified to address such a complaint.") (emphasis in the original).

Nationwide's second expert, Dr. James D. Petrick, a clinical neurologist, reported that he

---

[4] Since these documents are attached to the Amended Complaint, the Court may consider them on a motion to dismiss. *Bruni v. City of Pittsburgh*, No. 15-CV-1755, 2016 U.S. App. LEXIS 10019 (3d Cir. June 1, 2016) ("The court may . . . rely upon 'exhibits attached to the complaint and matters of public record.'") (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *see also Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

performed "a comprehensive battery of neuropsychological measures" on Homer. (Docket No. 17 at ¶¶ 50-51). From these tests, Dr. Petrick concluded that Homer suffered from depression but was otherwise normal, did not have significant cognitive defects or traumatic brain injury, and could continue working as a mechanical engineer. (*Id.* at ¶¶ 52-55). When cross-examined by Plaintiff's counsel, Dr. Petrick admitted that 60% of his examinations were performed for employers and insurance companies and 30% of his entire practice is defense medical examinations. (*Id.* at ¶¶ 59-60). Homer's attorney cross-examined Dr. Petrick on sixteen of his past reports, and in all sixteen he conceded he was a defense expert and testified in each of those cases that there was no cognitive defect or disability. (*Id.* at ¶¶ 61-63). He was then asked about another report which he submitted at the request of a plaintiff's attorney where he concluded that the individual in that case could not return to work. (*Id.* at ¶¶ 65-67). Homer avers that Dr. Petrick was "devastated" by this cross-examination as it showed Dr. Petrick would always support whichever party retained him. (*Id.* at ¶ 71).

During closing arguments, the attorney for Nationwide recapped the testimony of both experts. (*Id.* at ¶¶ 79-84). Homer now argues that in light of the facts described above, Nationwide knew or should have known that the experts were biased and should not have used their testimony at trial or referenced it again during closing arguments.

B. *Nationwide's Motion to Mold*

As noted, Nationwide filed a motion to mold the verdict pursuant to the High-Low Agreement and to dismiss the bad faith claim with prejudice. (*Id.* at ¶ 89). Nationwide's motion to mold stated: "Plaintiff's bad faith claim is dismissed with prejudice as of June 1, 2015." (*Id.* at ¶ 91). Homer argues that as written, Nationwide's motion would have dismissed any and all

bad faith claims, in particular those that occurred after, but on the same day as, the signing of the High-Low Agreement. (*Id.* at ¶¶ 90-96). Homer counters Nationwide's argument that its motion was "in artfully [sic] drafted," arguing "Plaintiff pointed out this effect in Plaintiff's Response to Defendant's Motion to Mold Verdict and Defendant never sought to correct the same." (*Id.* at ¶¶ 95-96).

### III. LEGAL STANDARD

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R .CIV. P. 8(a)(2). To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The United States Supreme Court in *Iqbal* clarified that its decision in *Twombly* "expounded the pleading standard for 'all civil actions.'" *Iqbal*, 556 U.S. at 684. The Supreme Court further explained that even though a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Id.* at 678-79. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Thus, "[a]lthough a reviewing court now affirmatively disregards a pleading's legal conclusions, it must still . . . assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Connelly,* 809 F.3d at 790 (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)).

The facial plausibility requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556–57) (internal citations omitted). Furthermore, the determination as to whether a complaint contains a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In light of *Iqbal*, the United States Court of Appeals for the Third Circuit has instructed that district courts should first separate the factual and legal elements of a claim, and accepting the "well-pleaded facts as true," should then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 679). The matter for this Court's determination is not whether the pleading party ultimately will prevail on the claim, but rather whether that party is entitled to offer evidence in support of it. *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 302 (3d Cir. 2011). Accordingly, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). As part of this task, this Court must "identify those allegations that, being merely conclusory, are not entitled to the presumption of truth." *Connelly*, 809 F.3d at 789. The Court is mindful that to meet the standard a plaintiff "need only put forth allegations [of fact] that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*,

578 F.2d at 213 (internal quotations omitted); *see also Connelly*, 809 F.3d at 791.

In considering a motion to dismiss, courts are not permitted "to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997). A court may, however, consider documents attached to the complaint. *Bruni*, 2016 U.S. App. LEXIS 10019, at *12 ("The court may . . . rely upon 'exhibits attached to the complaint and matters of public record.'") (quoting *Pension Benefit Guar. Corp.*, 998 F.2d at 1196); *see also Schmidt*, 770 F.3d at 249. A court must treat a motion to dismiss as one for summary judgment only when "other 'matters outside the pleadings are presented to and not excluded by the court.'" *Bruni*, 2016 U.S. App. LEXIS 10019, at *12 (quoting FED. R. CIV. P. 12(d)). Under those circumstances, "'[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting FED. R. CIV. P. 12(d)).

## IV. DISCUSSION

As an initial matter, the Court finds that the parties have not presented "other 'matters outside the pleadings.'" *Id.* (quoting FED. R. CIV. P. 12(d)). Accordingly, the Court will treat Nationwide's motion as a motion to dismiss and not as a motion for summary judgment. The Court will separately address Homer's insurance bad faith and UTPCPL claims.

### A. *Insurance Bad Faith Claim*

Bad faith on the part of an insurer under 42 Pa. Cons. Stat. § 8371 is defined as a "frivolous or unfounded refusal to pay proceeds of a policy." *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994) (citations omitted). The standard that a plaintiff must meet under Pennsylvania law is a relatively high one:

To succeed in a bad faith claim, the insured must present clear and convincing evidence that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa. Super. Ct. 1999), (citing *MGA Ins. Co. v. Bakos,* 699 A.2d 751, 754 (Pa. Super. Ct. 1997)). Bad faith in the context of insurance litigation has been defined as "any frivolous or unfounded refusal to pay proceeds of [a] policy." *Adamski v. Allstate Ins. Co.,* 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999). To constitute bad faith it is not necessary that the refusal to pay be fraudulent. However, mere negligence or bad judgment is not bad faith. *Id.* To support a finding of bad faith the insurer's conduct must be such as to "import[ ] a dishonest purpose." *Id.* It also must be shown that the insurer breached a known duty (*i.e.,* good faith and fair dealing), through some motive of self interest or ill will. *Id.*

*Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (Pa. Super. Ct. 2002); *see also Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (setting forth the elements of a bad faith claim); *W.V. Realty, Inc. v. N. Ins. Co.*, 334 F.3d 306, 312 (3d Cir. 2003) (same). Bad faith conduct "'implies an actual, subjective decision to commit a wrong act.'" *Schleinkofer v. Nat'l Cas. Co.*, 339 F. Supp. 2d 683, 688 (W.D. Pa. 2004) (quoting *Danley v. State Farm Mutual Auto. Ins. Co.*, 808 F. Supp. 399, 402 (M.D. Pa. 1992)).

Nationwide takes the position that there is no precedent under Pennsylvania law for litigation tactics to serve as the basis of a bad faith claim. (Docket No. 19 at 1). It argues that allowing Homer's Amended Complaint to go forward would "open the doors for any insurer to be subject to a bad faith lawsuit for putting on a defense at trial and [would] allow[] plaintiffs to dictate defendants' trial strategy." (Docket No. 19 at 14). Homer counters that courts in Pennsylvania have held that an insurer's conduct during the course of litigation may support a finding of bad faith. (Docket No. 31 at 11-12).

Review of Pennsylvania case law does not yield a hard and fast rule regarding what types of litigation tactics may serve as the basis for an insurance bad faith claim. Yet, some decisions indicate that certain acts committed during the course of litigation can constitute bad faith.

*O'Donnell*, 734 A.2d at 906. Courts are also mindful that all litigation is inherently adversarial and defendant insurers have a right to defend themselves in court. Therefore, state and federal courts in Pennsylvania have allowed bad faith claims for certain types of litigation conduct and not others, such as discovery violations:

> The Pennsylvania Superior Court has held that bad faith is actionable regardless of whether it occurs before, during or after litigation. *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa. Super. 1999) ("[W]e refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured."). The Superior Court made quite clear, however, that this did not mean that insureds may recover under Pennsylvania's bad faith statute "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim." *Id.* at 908 (quoting *Slater v. Liberty Mut. Ins. Co.,* No. 98–1711, 1999 WL 178367, at *2 n.3 (E.D. Pa. Mar. 30, 1999)). This general proposition comes with the caveat that using litigation in a bad faith effort to evade a duty owed under a policy would be actionable under Section 8371.
> In those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith. . . . .

*W.V. Realty, Inc.*, 334 F.3d at 313; *see also Slater*, 1999 WL 178367, at *2 ("Section 8371 provides a remedy for bad-faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit filed against it by an insured. The court is confident that the legislature did not contemplate a potentially endless cycle of § 8371 suits, each based on alleged discovery abuses by the insurer in defending itself in the prior suit.").

There are a few cases outside the discovery context where courts have allowed bad faith claims to go forward. In one case, a court denied a motion to dismiss a bad faith claim premised on an insurance company's "misrepresentations to the court" and filing of abusive motions during an insurance coverage action. *See Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 2002 WL 376923, at *3 (E.D. Pa. Feb. 28, 2002), *reversed in part on other grounds*, 337 F.3d 297 (3d Cir. 2003) ("Since Plaintiff's cause of action for insurance bad faith is not entirely

founded on Defendants' discovery tactics, the Court cannot say, at this time, that Plaintiffs cannot prove any set of facts which would entitle them to relief . . . ."). In another case, the court allowed a bad faith claim where the insurer "engaged in obstructive conduct and induced [plaintiff] to discontinue his state court suit by misrepresenting its intent to evaluate and settle his claim." *Cooper v. Nationwide Mut. Ins. Co.*, 2002 WL 31478874, at *4 (E.D. Pa. Nov. 7, 2002). A third court refused to dismiss a bad faith claim where the insurer allegedly filed a baseless counterclaim against the insured in a coverage action. *Krisa v. The Equitable Life Assurance Soc.*, 109 F. Supp. 2d 316, 321 (M.D. Pa. 2000). Consequently, a somewhat ill-defined line appears to be drawn between conduct which can be described as "defending the claim" and that which suggests "that the conduct was intended to evade the insurer's obligations under the insurance contract." *W.V. Realty, Inc.*, 334 F.3d at 313-14.

The parties cite a few cases specifically relating to expert witnesses, none of which are completely analogous. Nationwide points to *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 2006 WL 2289789, at *7 (W.D. Pa. Jan. 13, 2006). In *Gallatin*, the plaintiff argued the insurance company's use of an expert was in bad faith because the expert's methodology had no basis in Pennsylvania law and the expert had never actually applied that methodology before. *Id.* The court rejected that argument, finding it to be "a common and acceptable litigation tactic that Westchester had every right to employ" and noted that the plaintiff could subject the expert to vigorous cross-examination. *Id.* Homer cites to *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. Ct. 2004), for the proposition that a pattern and practice of choosing biased experts can constitute a bad faith claim. The facts in *Hollock*, however, were considerably more egregious than the present case. *See id.* at 416 (characterizing the insurance company's conduct

as "an intentional attempt to conceal, hide or otherwise cover-up the conduct of [its] employees").

In other jurisdictions, courts have developed more comprehensive rules for dealing with bad faith claims premised on litigation conduct. Essentially four approaches are employed. *See Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 518-20 (Ky. 2006) (collecting decisions). Arkansas, Wyoming, and Missouri have a blanket prohibition on introducing evidence of litigation conduct to show an insurer's bad faith. *See Sinclair v. Zurich American Ins. Co.*, 129 F. Supp. 3d 1252, 1258 (D.N.M. 2015); *Knotts*, 197 S.W.3d at 518 n.3. California takes another approach, allowing for "the introduction of unreasonable settlement behavior (specifically, low settlement offers) that occurs after suit has been filed while prohibiting the admission of litigation conduct, techniques, and strategies." *Knotts*, 197 S.W.3d at 519 (surveying California case law). At least one state, West Virginia, takes a more permissive approach and allows the introduction of litigation strategies and techniques as long as the insurer knowingly encouraged, directed, participated in, relied upon, or ratified the alleged wrongful conduct. *See Barefield v. DPIC Companies, Inc.*, 600 S.E.2d 256, 271 (W.V. 2004).

The fourth approach, and that which appears to be the one used in the greatest number of jurisdictions, allows evidence of litigation conduct to be admissible as evidence of bad faith in "rare cases involving extraordinary facts." *Sinclair*, 129 F. Supp. 3d at 1258 (collecting decisions). This view allows for the possibility that particularly egregious litigation conduct may constitute bad faith, but places significant emphasis on the interests of insurers in defending themselves, the responsibility of their attorneys to zealously represent them, the risk of confusion to the jury, and the ability of courts and rules of civil procedure to remedy most litigation abuses.

*See e.g.*, *Timberlake Const. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 341 (10th Cir. 1995); *Sinclair*, 129 F. Supp. 3d at 1258; *Palmer v. Farmers Ins. Exchange*, 861 P.2d 895, 913-15 (Mont. 1993); *Parsons v. Allstate Ins. Co.*, 165 P.3d 809, 818-19 (Colo. App. 2006); *see also The Insurer's Duty of Good Faith in the Context of Litigation*, 60 GEO. WASH. L. REV. 1931, 1976-79 (Aug. 1992) ("This Note advocates excluding evidence of postfiling conduct unless its probative value substantially outweighs its prejudicial effect. At the very least, courts approving previously unprecedented inroads upon the practical access of insurers to the courts should consider more carefully the costs and benefits of their decisions.").

In summary, the four approaches are: (1) most litigation conduct can constitute bad faith; (2) no litigation conduct can constitute bad faith; (3) only litigation conduct relating to settlement offers can constitute bad faith; and (4) litigation conduct can constitute bad faith but only in "rare cases involving extraordinary facts." It appears that the Supreme Court of Pennsylvania has not adopted an approach, to date. While other courts in the Commonwealth have found various types of litigation conduct to either constitute bad faith or not, no prior case is directly on point and these cases generally do not establish an overarching rule. *See supra* at 7-10. Thus, this Court must predict how Pennsylvania's highest court would decide the issue. *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1365-66 (3d Cir. 1993). The Court now predicts that the Supreme Court of Pennsylvania would adopt the fourth approach described above, i.e., that evidence of litigation conduct can be admissible as evidence of bad faith but only in "rare cases involving extraordinary facts."

In this Court's view, the Supreme Court of Pennsylvania would mostly likely adopt this approach for three reasons. First, it is the approach that most effectively balances an insurer's

interest in defending itself and the ability of courts and rules of civil procedure to handle most litigation abuses with the relatively broad scope of § 8731. The approaches that allow either the vast majority of litigation conduct or no litigation conduct to constitute bad faith do not adequately balance the competing sets of interests. Second, this is the approach used in most jurisdictions. *Sinclair*, 129 F. Supp. 3d at 1258 (finding on an issue of first impression under New Mexico law "I believe that New Mexico courts would follow what appears to be the majority view that allows evidence of bad faith in rare cases involving extraordinary facts"). Third, and most importantly, this is the only approach that is consistent with the Pennsylvania case law that already exists on the issue. As already discussed, the Superior Court has made clear that § 8731 applies to conduct before, during, and after litigation, but that it does not include minor or routine litigation conduct, such as discovery abuses. *O'Donnell*, 734 A.2d at 906-10. Subsequent decisions have allowed bad faith claims for more egregious conduct, such as filing a baseless counter claim in a coverage action, *Krisa*, 109 F. Supp. 2d at 321, an insurer inducing the plaintiff to drop his lawsuit by misrepresenting its intent to settle his claim, *Cooper*, 2002 WL 31478874, at *4, or actions described as "an intentional attempt to conceal, hide or otherwise cover-up the conduct of [insurer's] employees," *Hollock*, 842 A.2d at 416. Other decisions have refused to allow bad faith claims for actions which amounted to "a common and acceptable litigation tactic[.]" *Gallatin*, 2006 WL 2289789, at *7.

Having concluded that Pennsylvania precedent is most consistent with the fourth of the approaches described above, the Court now adopts the approach described in *Sinclair*, i.e., that evidence of litigation conduct is admissible as evidence of bad faith, but only in "rare cases involving extraordinary facts." 129 F. Supp. 3d at 1258. With this standard in mind, the Court

14

will evaluate each of Homer's allegations, in turn.

i. *The Use of Dr. Ferraro's Testimony*

Homer contends Nationwide acted in bad faith when it played Dr. Ferraro's videotaped deposition testimony at trial because it knew he was biased in its favor. (Docket No. 17 ¶ at 98). Unlike his allegations regarding Dr. Petrick (who is discussed below), Homer makes no accusation that Dr. Ferraro always finds in favor of whichever side pays him, always appears for defendants, or anything similar. (*See generally* Docket Nos. 17 at ¶¶ 81-84; 30 at ¶¶ 42-53; 31 at 8-9). Rather, the entire claim of bias stems from the fact that Dr. Ferraro noted in his report that Homer's ". . . major problem at this time appears to be his cognitive memory issues." (*Id.*). Homer attempted, during cross-examination and attempts now, to characterize this statement as Dr. Ferraro diagnosing Homer with cognitive problems. (*Id.*). Homer then argues that Dr. Ferraro "backtracked" under cross-examination and "dramatically changed his opinion" when he explained that he meant in his report that the cognitive issues were Homer's main *complaint* and that he did not, and is not qualified to, diagnose same. (*Id.*). Homer contends that this purported contradiction between Dr. Ferraro's report and his testimony demonstrates that he was biased and that Nationwide knew of his bias.

Contrary to Homer's assertion, nothing in Dr. Ferraro's report forecloses the explanation he provided during cross-examination. (*See* Docket No. 17-1 at 66). Rather, the more reasonable reading of the report is exactly as Dr. Ferraro explained. Nowhere in it does he write that he *diagnosed* Homer with cognitive problems. Rather, he raises a suspicion and suggests additional testing:

> At the present time, I do not feel that Mr. Homer needs any additional formal treatment for his neck or back problems. However, I *suspect* that his difficulty trying

> to find and maintain a job has to do with his cognitive problems. *I would recommend he undergo formal neuropsychological testing and evaluation at either a Concussion Clinic or by a psychiatrist.*

(*Id.*) (emphasis added). The plain language of the report shows that Dr. Ferraro evaluated Homer for neck and back problems and, upon finding none, recommended that Homer see an appropriate specialist to evaluate his complaints of cognitive problems. Consequently, Nationwide's decision to use Dr. Ferraro's testimony at trial in no way shows that "the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim."[5] Homer's bias allegation against Dr. Ferraro fails as conclusory and the Court grants Nationwide's Motion to Dismiss as it pertains to the use of Dr. Ferraro's testimony at trial.

  ii.  *The Use of Dr. Petrick's Testimony*

  The allegations concerning Nationwide's second expert, Dr. Petrick, present a slightly closer case, but also do not rise to the level of bad faith. Homer's claim of bias is essentially that during cross-examination, his attorney "devastated" Dr. Petrick by questioning him on his prior

---

[5] While not entirely clear from the record before this Court, there is no indication Homer objected to the use of the experts' videotaped testimony at the time of trial. (*See* Docket No. 44 at 3). Hence, there could be an issue of waiver here, as there are a number of ways a party can waive an argument or objection. *See e.g.*, *Belmont Indus., Inc. v. Bethlehem Steel Corp.*, 62 F.R.D. 697, 702-03 (E.D. Pa. 1974) ("[E]vidence to which a timely objection is not made becomes competent."); *Anderson v. McAfoos*, 57 A.3d 1141, 1149 (Pa. 2012) (failure to object to the competence of an expert at trial is waived on appeal) (citing Pa.R.A.P. 302(a)); *Warden v. Zanella*, 423 A.2d 1026, 1029 (Pa. Super. Ct. 1980) (argument that service of the complaint was improper was waived when not raised until after trial). Likewise, Homer did not plead that he raised the High-Low Agreement as a defense to the use of the testimony at trial. To the extent he and his counsel interpreted same to preclude the challenged presentation of the testimony, that argument may have also been waived because even if there was language in the contract prohibiting same, contract provisions may be waived either expressly or through implication. *See, e.g.*, *Trumpp v. Trumpp*, 505 A.2d 601, 603 (Pa. Super. Ct. 1985). An explicit contractual provision may be waived when "there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived." *Den-Tal-Ex, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989). In the Court's view, Plaintiff's counsel should have placed an objection on the record at the time Nationwide introduced the now challenged testimony. This Court is not convinced a plaintiff and his counsel should be permitted to create a bad faith claim simply by silently allowing conduct they find objectionable to take place. It is particularly concerning in this case given the depositions had been videotaped in advance and Homer and his counsel were fully aware of the facts on which they base their allegations of bias by the time they drafted the High-Low Agreement and Nationwide used the testimony at trial.

reports and revealing that Dr. Petrick always finds in favor of the party paying him, which is usually the defense. (Docket No. 30 at 9-10). Nationwide argues now, as Dr. Petrick testified on cross, that Homer simply "cherry-picked" the sixteen reports and used them out of context. (Docket No. 19 at 11) ("In doing so, counsel selectively summarized lengthy reports down to a conclusory paragraph, and asked Dr. Petrick to agree with him."). In response, Homer maintains that those sixteen reports were the only ones he could find and that all sixteen support his charge of bias against Dr. Petrick. (Docket No. 31 at 9).

The cross-examination of Dr. Petrick may have been effective, but does not appear to be extraordinary. (*See generally* Docket No. 17-1 at 69-84). Rather, it was the sort of cross-examination that is typical of these kinds of cases. Dr. Petrick explained in detail the "comprehensive battery of neuropsychological measures" he employed in evaluating Homer. (Docket No. 17-1 at 72-73). But, Homer did not cross-examine him on the medicine or methodology. Rather, Plaintiff's counsel zeroed in on the nature and number of examinations Dr. Petrick performs annually. He testified that he does between 50 and 100 litigation related examinations a year (out of a total of around 500 examinations he performs yearly). (*Id*. at 80). That Homer produced sixteen reports over the course of Dr. Petrick's twenty plus year career is not a particularly remarkable sample size.[6] Indeed, Homer was able to fully address his concerns about Dr. Petrick through cross-examination. *See Gallatin*, 2006 WL 2289789, at *7 (on different facts, finding no bad faith claim relating to expert and explaining the plaintiff could effectively address his concerns through cross-examination). If anything, Homer benefited from Nationwide's decision to use Dr. Petrick's testimony at trial, particularly given the size of the

_____

[6] Additionally, by Homer's logic, every one of the other parties that hires Dr. Petrick 50-100 times a year is equally guilty of bad faith.

verdict the jury rendered. And, from a policy perspective, it would be problematic to allow an insured to bring a bad faith claim every time there is an effective cross-examination of one of the insurance company's experts.

Homer also argues that Dr. Petrick's opinion conflicted with the opinion of Homer's expert. (Docket Nos. 17 at ¶¶ 56-57; 17-1 at 75). The mere presence of dueling experts is not novel or unique, and even where the insured prevails with the jury, does not necessarily establish that the insurer's expert was wrong, let alone that the insurer acted in bad faith in allowing the expert to testify. *See Montgomery v. Mitsubishi Motors Corp.*, 2006 WL 1892719, at *2 n.3 (E.D. Pa. July 10, 2006) (where one party's experts did not agree with the other party's expert, "this disagreement does not lead the Court to conclude that one expert's opinion is wrong and the other correct. Rather, the credibility and veracity of these 'dueling' expert witnesses is a matter for cross-examination at trial."); *see also* The Pennsylvania Bar Institute, *Pennsylvania Suggested Standard Civil Jury Instructions*, 4.100 (Civ) (4th ed. 2016) ("In resolving any conflict that may exist in the testimony of expert witnesses, you are entitled to weigh the opinion of one expert against that of another.").

In the Court's view, nothing that Homer alleges about the defense experts is at all rare, extraordinary, or egregious. His concerns were fully addressed by cross-examination and use of his own experts. Hence, Nationwide's Motion to Dismiss is granted as it relates to the allegations of bias in Dr. Petrick's testimony.

### iii. *Nationwide's Closing Argument*

Homer next alleges that Nationwide committed bad faith when its attorney referenced the purportedly biased testimony of Dr. Ferraro and Dr. Petrick in his closing argument to the jury.

(Docket No. 17 at ¶ 98). As an initial matter, since the Court has already found that Nationwide's use of expert testimony did not constitute bad faith, referencing same in closing arguments likewise cannot be bad faith. Also, since counsel for Homer did not object during Nationwide's closing argument, (*see generally* Docket No. 17-2 at 2-26), there is a serious question as to whether his challenge has now been waived. *See supra* at 15 n.4. Moreover, Homer was not prejudiced by the expert testimony or Nationwide's closing argument, as the jury returned a $1.61 million verdict in his favor.

Recounting the evidence presented at trial is the point of a closing argument, and doing so is a perfectly reasonable part of conducting a defense. *See* The Pennsylvania Bar Institute, *Pennsylvania Suggested Standard Civil Jury Instructions*, 1.170 (Civ) (4th ed. 2016) ("After all the evidence has been presented, the lawyers will present to you closing arguments to summarize and interpret the evidence in an attempt to highlight the significant evidence that is helpful to their clients' positions. As with opening statements, closing arguments are not evidence."). Reviewing Nationwide's closing argument, its counsel simply recapped the testimony the jury heard and it was then up to the jury to determine credibility; find the facts; and apply the law.

Parsing an insurer's closing argument after the fact through a bad faith action endangers an insurer's ability to defend itself. It would also threaten the independent duty held by an insurer's attorney to perform competently and professionally in zealously representing his or her client. *See* Pa. RPC 1.1, 1.3 (a lawyer has a duty to competently represent his or her client and to act with reasonable diligence). The conduct Homer calls bad faith goes directly to the heart of

the strategy and work product of Nationwide's attorney.[7]   It is a stretch to ask this Court to not only second-guess that strategy after the fact, but also to call it bad faith.

      iv.    *Nationwide's Motion to Mold*

    Homer alleges that Nationwide's wording of its motion to mold represented bad faith because it would have (arguably) dismissed any and all bad faith claims, even those occurring after June 1, 2015. (Docket No. 17 ¶¶ 90-94, 98). Nationwide responds that it was simply a case of inartful drafting of its motion and points out that the High-Low Agreement itself, which was drafted by Plaintiff's counsel, was ambiguous in the first place. (Docket No. 19 at 16-17). Since the Agreement stated that bad faith claims "prior to the date" and "after the date" were dismissed, the Court agrees with Nationwide that the Agreement was ambiguous with regard to bad faith claims arising on the date of the Agreement.[8]  *See Vargo*, 94 Fed. Appx. at 943 (holding that "under Pennsylvania law, a high-low agreement may be construed as a settlement" and explaining that ""basic contract principles do indeed apply to settlement agreements") (internal quotations omitted).   The Court would further note that under Pennsylvania law, ambiguous contract provisions are to be construed against the drafter.[9]  *Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.*, 77 A.3d 1, 7 (Pa. Super. Ct. 2013) (citations omitted). One would think Homer and his counsel would have taken extra care in drafting the bad faith

---

[7] The Court notes that were this case to proceed into discovery, there would be considerable challenges with respect to attorney-client privilege and attorney work product. *See, e.g., In re Cendant Corp. Securities Litigation*, 343 F.3d 658 (3d Cir. 2003); *Cotillion v. United Refining Co.*, 279 F.R.D. 290 (W.D. Pa. 2011); FED. R. CIV. P. 26(b). Further, counsel for both parties in the previous action would need to be witnesses, may have to be deposed, and likely need to secure their own representation.

[8] As discussed, the Agreement excluded claims for bad faith acts occurring "prior to" and "after" the date of its execution. The term "prior" is defined as "[t]he former; earlier; preceding," and "at any time prior to" is defined as "mean[ing] that it occurred before the given date." BLACK'S LAW DICTIONARY (10th ed. 2014). The term "after" is defined as "[l]ater, succeeding, subsequent to, inferior in point of time or of priority or preference." *Id.*

[9] Homer's counsel is experienced, Homer is educated, and regardless, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood." *Simeone v. Simeone*, 581 A.2d 162, 165 (Pa. 1990).

waiver given the possibility that Nationwide might still use expert testimony Homer already believed to be biased and in bad faith.[10]

Nationwide further notes that Homer's response to its motion to mold also deviated from the actual wording of the agreement, stating "on or after" rather than "prior to the date" and "after the date." Ultimately, the allegations regarding the motion to mold do not establish bad faith. Homer's interpretation of Nationwide's wording – that it would have effectively barred all claims – is possible, but the inclusion of "as of June 1, 2015" seems an odd choice, if Nationwide's purpose was to have the Court dismiss all past, present, and future claims of bad faith by Homer. Whether or not "as of June 1, 2015" would dismiss claims arising on June 1, 2015 is especially ambiguous. Regardless, Homer has not pled any facts that suggest it is plausible that Nationwide and its counsel knowingly acted in bad faith with its wording of the motion to mold. Nationwide's wording seems reasonable given the somewhat ambiguous wording of the agreement itself, as drafted by Plaintiff's counsel and agreed to by Defendant's counsel. Ambiguous wording of a motion pursuant to an ambiguously worded agreement is not the type of rare or extraordinary litigation conduct that should constitute bad faith. At most, what the Court sees is sloppy lawyering on both sides.

In his brief, Homer contends that Nationwide's argument that the Agreement was ambiguous is barred by collateral estoppel because the state court used Homer's wording and not Nationwide's in its order molding the verdict. (Docket No. 31 at 16). That is not the purpose of collateral estoppel, which would prevent this Court from *ruling* differently than the state court. *See generally Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 356-57 (3d Cir. 1999) (the doctrine of

---

[10] Nationwide would have provided Homer with a pre-trial statement indicating that Dr. Ferraro and Dr. Petrick may be witnesses at trial. *See* Allegheny Court of Common Pleas Local Rule 212.2 (requiring the parties to exchange pre-trial statements in conformity with Pa.R.C.P. 212.2).

collateral estoppel is about preventing parties from "relitigating" in a new court and giving acts of the first court full faith and credit). Nationwide's point is only that its position in the first action was not unreasonable, not that this Court should issue a ruling contrary to that of the Court of Common Pleas. The doctrine of collateral estoppel, thus, has no application here.

In sum, there is no basis for bad faith related to the drafting and presentation of Nationwide's motion to mold.

B. *UTPCPL Claim*

"To state a claim under Pennsylvania's [UTP]CPL, plaintiffs must allege facts from which the court can plausibly infer: (1) deceptive conduct or representations by defendant; and (2) justifiable reliance by plaintiffs on defendant's deceptive conduct that caused plaintiffs' harm." *Papurello v. State Farm Fire & Cas. Co.*, 144 F. Supp. 3d 746, 776 (W.D. Pa. 2015) (citing *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004)).

Nationwide moves for dismissal of the UTPCPL claim on the grounds that Homer has not pled sufficient facts to establish the elements of justified reliance or ascertainable loss. (Docket No. 19 at 17-18). Homer's response on either of these elements is not entirely clear. (*See generally* Docket No. 31 at 16-17). It does not appear from the facts alleged in the Amended Complaint that Homer justifiably relied on Nationwide's actions in any way. Similarly, it is not clear what Homer's ascertainable loss would be since he received the maximum award possible in light of the High-Low Agreement. Pennsylvania courts have held that the hiring of an attorney to bring a UTPCPL claim does not satisfy the ascertainable loss requirement. *Grimes v. Enterprise Leasing Co. of Phila., LLC*, 105 A.3d 1188, 1193 (Pa. 2014). Because Homer has not

pled justified reliance or ascertainable loss, his UTPCPL claim will be dismissed.

## V.     CONCLUSION

For the foregoing reasons, the Court finds Homer has not alleged facts sufficient to state a

claim for insurance bad faith or violation of the UTPCPL.  Nationwide's Motion to Dismiss [18]

will be granted and Homer's Amended Complaint will be dismissed, with prejudice.

An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: August 26, 2016
cc/ecf:  All counsel of record